**KENNEDY ELECTRIC COMPANY,
INC., Plaintiff-Appellee,**

v.

**UNITED STATES POSTAL SERVICE,
Defendant-Appellant.**

No. 74–1218.

United States Court of Appeals,
Tenth Circuit.

Argued Nov. 12, 1974.

Decided Dec. 30, 1974.

Rehearing Denied Jan. 30, 1975.

Robert E. Benson, of Holland & Hart, Denver, Colo., for plaintiff-appellee.

Thomas G. Wilson, Atty., Department of Justice (Carla A. Hills, Asst. Atty. Gen., James L. Treece, U. S. Atty., and Leonard Schaitman, Washington, D. C., on the brief), for defendant-appellant.

Before LEWIS, Chief Judge, and BREITENSTEIN and McWILLIAMS, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This is a suit by a subcontractor on a federal postal facility construction project to recover amounts due for labor and materials. Section 409(a), 39 U.S.C., and 28 U.S.C. § 1339 confer jurisdiction. Recovery is sought out of funds both retained and disbursed. The case is unusual in that the payment and performance bonds required by the Miller Act, 40 U.S.C. § 270a, were not furnished and the prime contract was executed in violation of that statute. The district court gave judgment for the subcontractor, Kennedy Electric Co., Inc. v. United States Postal Service, D.Colo., 367 F.Supp. 828, and Postal Service appeals. We affirm.

Plaintiff-appellee, Kennedy Electric Company, a Colorado corporation, is engaged in the electrical construction business. Defendant-appellant, United States Postal Service, is an independent establishment of the United States, 39 U.S.C. § 201, with the power to sue and be sued, 39 U.S.C. § 401(1). Under the Postal Reorganization Act, 39 U.S.C. § 101 et seq., it succeeded to the interests of the former Post Office Depart-

ment on July 1, 1971. The assets and liabilities of the Post Office Department were transferred to the Postal Service and constituted its initial capital. 39 U.S.C. § 2002.

The principal facts were stipulated. No party objects to the fact findings of the trial court. For clarity we will refer to the former United States Post Office Department as Department, and to the recently created United States Postal Service as Service. On December 30, 1969, Department awarded to J. C. Corrigan Co. (Corrigan) a contract for the construction of a mail facility at Milwaukee, Wisconsin. Although payment and performance bonds were required to be filed in 10 days, none were ever filed. Corrigan was unable to obtain the bonds and neither filed them nor called the matter to the attention of Department. The failure to file the bonds was not discovered by Department until April, 1971. Department determined that Corrigan had wilfully failed to furnish the required bonds and on May 10, 1971, terminated the contract.

The contract price, adjusted for additional work and change orders, was $998,854.47. Corrigan subcontracted part of the work to Corrigan Construction Company. The trial court held that the two Corrigan companies "are for all practical purposes a single entity." 367 F.Supp. at 829. All payments on the contract were made to First National Bank of Boston, the assignee of Corrigan. The construction company subcontracted part of the work to plaintiff Kennedy which furnished labor and materials. A balance of $61,281.31 remains unpaid on the Kennedy subcontract. Corrigan is in bankruptcy and Corrigan Construction Company is insolvent. Both have failed and refused to pay Kennedy and neither has funds, or sources of funds, with which to pay Kennedy.

By March 10, 1970, Department knew that Kennedy was a subcontractor furnishing labor and materials for the project. In the months that followed Kennedy made repeated inquiries of Department as to project status. Department on many occasions called Corrigan's attention to the lack of satisfactory progress. Despite its concern Department made no effort to comply with the regulation on project supervision, 41 C.F.R. § 1–30.521, and did not investigate the reasons for delay, the status of payments to subcontractors, or the financial position of Corrigan.

The contract and applicable regulations limited progress payments to 70% of costs incurred with a maximum of 70% of the contract price. As of November 27, 1970, Department had made to Corrigan's assignee progress payments of $684,064.00. Up to this time progress payments were made on invoices containing the required information. See 41 C.F.R. § 1–30.519. Payments made thereafter were not on proper invoices. The progress payments exceeded the amount allowable both by the contract and the regulations.

In February, 1971, Department made a progress payment of $14,500.00 and in March a further payment of $190,747.00. These payments to the assignee were made without the required invoices. In making these two payments Department did not comply with the provisions of 41 C.F.R. § 1–30.505 providing that the head of the procuring activity, or a duly designated official, must approve unusual progress payments, and the provisions of 41 C.F.R. § 30–521.1 requiring assurance that the unpaid balance be sufficient to cover costs of completion or that contractor have adequate resources to complete. Department did not know the intended disposition of the funds by Corrigan's assignee.

On July 1, 1971, Department transferred to Service on account of the Milwaukee contract assets in the amount of $107,698.47 representing obligated appropriations on the books of Department. A third party completed the contract on August 15, 1971.

After a non-jury trial the district court held that there remained in Service's hands a fund of $35,739.47 on which Kennedy had an equitable lien. It also

held that Kennedy had an equitable lien on the March 24, 1971, payment of $190,747.00 made to the assignee. Judgment was entered for Kennedy, and against Service, for $61,281.31 plus interest.

Service argues that sovereign immunity bars the suit. It seeks to avoid 39 U.S.C. § 401, which authorizes Service to sue and be sued, by asserting (1) the suit seeks monetary recovery from the Treasury of the United States and (2) the Kennedy claim was not a legal liability of Department assumed by Service under the Postal Reorganization Act.

F.H.A. v. Burr, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724, says that absent implied exceptions and restrictions, not here present, or other showing that Congress used the phrase in a narrow sense, "it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances would be."

■ Service points out that its funds are held in the Treasury of the United States, 39 U.S.C. § 2003(a), and that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury." Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209; see also Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15. We can discern no congressional intent to emasculate the "sue or be sued" provision of § 401 by § 2003(a). We are concerned with the right to sue and recover judgment, not with any question of execution to enforce the judgment. See F.H.A. v. Burr, 309 U.S. at 250–251, 60 S.Ct. 488.

■ The Postal Reorganization Act provides, 39 U.S.C. § 2002(a)(2), that upon the start of Service operations the unexpended balances of appropriations to Department and "all liabilities chargeable thereto shall become assets and liabilities, respectively, of the Postal Service." Service says that the claim of Kennedy was not a legally enforceable

liability of Department and, hence, it never became a liability of Service. The argument begs the question. Service may be sued. Determination of liability goes to the merits, not to jurisdiction. We reject the contention that sovereign immunity destroys jurisdiction and turn to the merits.

■ The Miller Act, 40 U.S.C.A. § 270a, was intended to provide a remedy for suppliers of labor and material to a federal project. These suppliers do not have their usual security interest because a lien cannot attach to federal property. Miller Act protection goes to those who have a contractual agreement with a prime contractor or a subcontractor. F. D. Rich Co., Inc. v. United States, 417 U.S. 116, 122, 94 S.Ct. 2157, 40 L.Ed.2d 703. Kennedy was within the protected class but, because of Department's failure to comply with the statute, the contractor did not furnish a payment bond. There is no surety from which Kennedy may recover.

■ Kennedy relies on a two-pronged equitable lien. The first relates to the $35,739.47 which remained in Service's hands from the obligated appropriation transferred to it by Department. The computation appears in the district court's findings. See 367 F.Supp. at 832. In this regard we reject Service's claim for liquidated damages in the sum of $45,000.00. The project has been completed. Although the contract permits recovery of both cost of completion and liquidated damages, Service's claim for liquidated damages must be weighed against subcontractor's claim for payment on account of the labor and materials which it furnished. The equities favor subcontractor. A court of equity may subordinate a claim because of equitable considerations. See Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281. We agree with the trial court that subordination of Service's claim is in order.

■ The second prong relates to Department's March 24, 1971, payment of $190,747.00 to Corrigan's assignee. Payment was made in violation of vari-

ous pertinent regulations. See e. g. 41 C.F.R. §§ 1 30.505, 1 30.519, 1–30.521–1, and 1 30.521 2. Department then had notice of the Kennedy claim and knew that there was slight chance that the money would be used to complete the contract or to pay the subcontractor. See 367 F.Supp. at 830–831. The courts have consistently held that the government cannot escape liability to a Miller Act surety by making a wrongful payment. See Fireman's Fund Insurance Company v. United States, 421 F.2d 706, 709, 190 Ct.Cl. 804, and cases there cited; see also Hanover Insurance Company v. United States, S.D.N.Y., 279 F.Supp. 851, 853. For our present purposes we shall treat both the funds remaining in Service's hands and the $190,747.00 payment to the assignee as retainage.

The controlling issue is whether the subcontractor had an equitable lien on the retainage. The first pertinent decision of the Supreme Court is Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412. That case related to the respective rights of a surety, which had completed a construction contract after default, and of an assignee of the contractor. The Court upheld judgment for the surety saying that the equity of the assignee, if any, was subordinate to that of the surety. 164 U.S. at 240, 17 S.Ct. 142.

In Henningsen v. United States Fidelity & Guaranty Company, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, a surety, under the then applicable Heard Act, 28 Stat. 278, on a federal construction contract was required to pay claims for labor and material. The contractor assigned the retainage to a bank. The surety sued to enjoin the disbursing officer from paying the assignee. The Court held for the surety saying that "the question turns upon the respective equities of the parties," 208 U.S. at 409, 28 S.Ct. at 391, and that surety "paid the laborers and material-men, and thus released the contractor from his obligations to them, and to the same extent released the government from all equitable obligations to see that the laborers

and supplymen were paid." 208 U.S. at 410, 28 S.Ct. at 391.

United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022, was a case in which a Miller Act surety had paid those supplying labor and material to the contractor. Surety asserted a claim against the retainage. The government asserted a set-off arising from a debt owed it by the contractor under a separate and independent transaction. The Court allowed the set-off. The Court said that laborers and materialmen do not have enforeable rights against the government for their compensation, 332 U.S. at 241, 67 S.Ct. 1599, that as a substitute for their customary lien protection the Miller Act requires a payment bond, Ibid., and that "one cannot acquire by subrogation what another whose rights he claims did not have, Ibid. at 242, 67 S.Ct. at 1603. Service reads Munsey as holding that laborers and materialmen have no enforceable right against the United States for their compensation and, hence, is dispositive of the case at bar. Kennedy counters with the statement in the opinion, 332 U.S. 242, 67 S.Ct. 1603:

"We need not decide whether laborers and materialmen would have any claim to the retained percentages, if both contractor and surety failed to pay them."

The basic premise of Munsey is that the laborers and materialmen are protected by the statutorily required payment bond, 332 U.S. at 243–244, 67 S.Ct. 1599. That premise is absent from the case at bar. Department, in violation of the Miller Act, made the contract without requiring the bond. Munsey says nothing about the equitable considerations discussed in Prairie State Bank and Henningsen.

Pearlman v. Reliance Insurance Company, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190, was a dispute between the bankruptcy trustee of a government contractor and the contractor's payment-bond surety over retainage held by the government. The district court held

that pre-Munsey cases established the priority of the surety over general creditors, In re Dutcher Construction Corp., W.D.N.Y., 197 F.Supp. 441, and the Second Circuit affirmed, 298 F.2d 995. The Court granted certiorari because of the conflict with decisions of other circuits, including American Surety Company of New York v. Hinds, 10 Cir., 260 F.2d 366. The conflict was resolved in favor of the Second Circuit. The Court held that "*Munsey* left the rule in *Prairie Bank* and *Henningsen* undisturbed." 371 U.S. at 141, 83 S.Ct. at 237, and said, Ibid.:

> "We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it."

Service distinguishes Pearlman on the ground that it concerned only a question of priorities between a surety and the contractor's trustee in a fund upon which the government made no claim. The priorities in Pearlman were decided on equitable principles which apply here. When it paid assignee, Department was not a claimant to the fund but a stakeholder. It chose to establish priority without resort to the judicial process.

Service stresses United States Fidelity & Guaranty Co. v. United States, Ct.Cl., 475 F.2d 1377, (USF&G) as a correct analysis and application of the Munsey and Pearlman decisions. In that case the Miller Act surety had paid its obligation in full. Certain subcontractors who had not been paid were joined as co-plaintiffs. The plaintiffs asserted rights against retainage and on account of an improper progress payment. The government claimed a tax lien on the retainage. After the tax was satisfied and deduction was made for liquidated damages, over $4,000.00 remained unexpended from the contract funds.

The court held against the surety because it could not recover on the basis of amounts owed subcontractors but not paid by it. The court held that the unpaid subcontractors had no standing to sue the United States, 475 F.2d at 1382. The court did recommend that the government either pay the subcontractors or file an interpleader "in order to see to it that the Government does not retain possession of funds to which the subcontractors have an equitable claim." 475 F.2d at 1383.

USF&G is a different case from that at bar. We do not have a standing question. Our suit is against an independent establishment having the power to sue and be sued. Subcontractor Kennedy has a direct interest. In USF&G a Miller Act bond was furnished and satisfied. Here we have no bond. USF&G recognizes the equities of the unpaid subcontractors and suggests procedures to prevent an inequitable result. 475 F.2d at 1383. Service does not suggest any procedure which Kennedy may take other than that followed here, and we know of none.

More importantly the effort in USF&G to reconcile Munsey and Pearlman does not convince us. Munsey says that it does not decide whether subcontractors have any claim to retainage if both contractor and surety fail to pay, 332 U.S. at 242, 67 S.Ct. 1599. Pearlman says that Munsey held only that the government could exercise its set-off right, 371 U.S. at 140, 83 S.Ct. 232. Accordingly, there is nothing to reconcile.

■ Service would reject decisions upholding the rights of subrogated sureties because they relate to situations where the person for whom the surety is substituted could sue under the Tucker Act, 28 U.S.C. § 1491. They say that we are concerned with a subcontractor who may not sue. Munsey expressly left open the question of any claim of laborers and materialmen against retainage if both

prime contractor and surety failed to pay. 332 U.S. at 242, 67 S.Ct. 1599. In the case at bar the contractor failed to pay and there is no surety. Department had the benefit of the services and material furnished by the subcontractor and the asset created by that benefit was transferred to Service, which also has the retainage. Although the Supreme Court has not decided the specific point now in issue, there is no discernible difference between the equities of the sureties, which were upheld in Prairie State Bank and Henningsen, and the equities of the subcontractor now suing. In like circumstances a private enterprise could not take advantage of the misconduct of its transferor. Service is just as amenable to the judicial process as is a private enterprise. F.H.A. v. Burr, 309 U.S. 242, 245, 60 S.Ct. 488, 84 L.Ed. 724.

We are not impressed with the argument of Service that the subcontractor never made a demand on Department. There was no need for demand. Department knew of the subcontractor's claim and led the subcontractor to believe that Department would not process progress payment billings in excess of 70%. To argue that a demand is necessary is to forget fair play and to reward misconduct.

The question remains of the funds to which the equities of the subcontractor attach. As to the $35,739.47 remaining in Service's hands we have held that equity requires the subordination of Service's liquidated damage claim to the claim of the subcontractor. The amount is insufficient to pay the subcontractor in full and resort must be had to the $190,747.00 paid to Corrigan's assignee.

The cases such as Fireman's Fund, 421 F.2d 706, 190 Ct.Cl. 804, holding that the government cannot escape liability by wrongful payment, concerned Miller Act sureties. The principle is not changed by the fact that here we have an unpaid subcontractor rather than a surety. Department compounded its error in contracting without bond by wrongfully paying to an assignee after notice of the subcontractor's claim. It

arrogated to itself determination of entitlement to the fund which it held. The subcontractor had a legally enforceable right against Department. The Postal Reorganization Act transferred that liability to Service. Service may not profit by the wrongs of its predecessor. See United States v. State Bank, 6 Otto 30, 36, 96 U.S. 30, 36, 24 L.Ed. 647. The subcontractor has an equitable lien both on the fund remaining in Service's hands and on the money wrongfully paid to the assignee.

 Service contends that the award of pre-judgment interest was wrong because the claim was unliquidated. In advance of trial the parties stipulated the amount due Kennedy. For all that appears in the record, the amount was readily ascertainable. The fact that liability was disputed does not preclude pre-judgment interest. See North Drive-In Theatre Corporation v. Park-In Theatres, Inc., 10 Cir., 248 F.2d 232, 237.

Affirmed.